56 CCPA

## Application of Robert Ben BOOTH.
## Patent Appeal No. 8018.

United States Court of Customs and Patent Appeals.

Jan. 16, 1969.

Samuel Branch Walker, Stamford, Conn., Wm. P. Spielman, Washington, D. C. (Harry H. Kline, of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Lutrelle F. Parker, Arlington, Va., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, ALMOND, and BALDWIN, Judges.

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals [1] affirming the examiner's rejection of claims 1–3, 11, 12, 14, and 20 of application serial No. 179,287, filed March 7, 1962, for "Fluidizing Solids in Aqueous Suspensions." Claims 17 and 18 stand allowed.

The issue is whether appellant's claimed invention is obvious and hence unpatentable under 35 U.S.C. § 103.

The claimed invention relates to the treatment of a suspension of solid particles in water. The invention is particularly concerned with suspensions containing both coarse and fine particles. In suspensions of this type there is a tendency for the coarse particles to settle out more rapidly than the fine particles. This may result in the formation of a layer of coarse material at the bottom of a vessel used to contain the suspension, which may adversely affect the operation of agitators and other mechanical equipment. To avoid this problem, it has been known to add glue to the suspension to act as a suspending agent. However, this may not always be effective, particularly in acid solutions.

Appellant has found that a water-soluble polyelectrolyte resin such as polyacrylamide can be used to solve all of these problems effectively. Appellant found that these polyelectrolytes, when added in the proper amounts, will prevent the larger particles of a suspension from settling out prior to settling of the smaller particles. Appellant found that this treatment causes the formation of a uniform mixture of coarse and fine solids which, when it eventually does settle out, forms a relatively light and fluid mass of sediment that is easily resuspended.[2]

---

1. The board consisted of Asp, Lidoff and Rosa, Examiners-in-Chief. Mr. Lidoff wrote the opinion of the board.

2. The phenomenon is described and illustrated in the following passages from the Booth application:

> It has now been found that by introducing from about 0.005 to 5 pounds per ton of suspended solids of a polyelectrolyte into the aqueous suspension there is a tendency for the finer particles to integrate with larger and give a composition of more uniform characteristics, and hence fluidize the suspension.
>
> \* \* \* \* \*

> The effect which herein is called fluidizing, or anti-caking, or anti-packing, is rather difficult to explain theoretically. In certain tests, for instance, it is found that if a suspension of fine and a coarse minerals is agitated, the material remains fluid and fairly easy to handle. If, however, stirring is stopped, the coarser solids rapidly drop out and thus form a stable dense layer. In contradistinction thereto by using the present polyelectrolytes there is formed a fluidized suspension in which the solids drop uniformly, if at all, as a homogeneous fluidized mass so that on moderate agitation the solids are again uniformly suspended.

Appellant claims both method and composition. As illustrative, method claim 1 and composition claim 11 are reproduced as follows:

1. In the handling and manipulation of a suspension of solids in water in which the solids range from comparatively coarse, which do not pass through 65 mesh, to very fine materials, which will pass through 325 mesh, and which suspension has a high solids content of at least about 30% solids, and which suspension when in a quiescent state tends to separate with the formation of a solid unwieldy cake which stalls agitators, the step which comprises adding to said water suspension of solids a small but effective amount of a suspending agent, form [sic] 0.005 to 5 pounds per ton of suspended solids of a water soluble polyelectrolyte resin, having the structure, in acid form:

$$H-(CH_2-CH)_n-(CH_2-CH)_m-(CH_2-CH)_o-H$$

where the substituents are $C{=}O$, $O$, $H$ on the first; $C{=}O$, $NH_2$ on the second; and $C$ (triple bond) $N$ on the third.

where n, m and o are whole numbers, and the groups within the parentheses may occur in random order and orientation, uniformly dispersing the polyelectrolyte throughout the suspension, agitating the suspension, thereby producing a suspension which is of uniform characteristics and from which the solids drop out as an unclassified readily resuspendable material.

11. A fluidized resuspendable mineral suspension pulp containing solids which do not pass through 65 mesh and fines which will pass through 325 mesh and substantially homogenous [sic] throughout in which the fines are integrated with the coarse material by from 0.005 to 5 pounds per ton of solids of a water soluble polyelectrolyte, which is an ampholytic linear carbon chain vinyl polymer consisting essentially of recurring carbamylethylene and carboxyethylene linkages and salts thereof, having a weight average molecular weight in excess of 100,000, thereby producing a suspension which is of uniform characteristics and from which the solids drop out as an unclassified readily resuspendable material.

The claims stand rejected as directed to obvious subject matter under 35 U.S. C. § 103 in view of an Australian patent No. 200,682 to Pye having an effective date of Jan. 11, 1956.

Pye is directed to a method of treating suspensions of solids in water by the addition of acrylamide polymers. Of particular interest in the disclosure are Examples 4 and 5 which read:

Example 4

A phosphate ore from the so-called "leach zone" overlying a Florida phosphate deposit was beneficiated by grinding and wet-screening with removal of the fraction of size less than 14 mesh and greater than 150 mesh, the latter consisting chiefly of silica impurities. The remaining solids, consisting chiefly of calcium phosphate and clay smaller than 150 mesh, were suspended in water to form a slurry containing 20 percent by weight of solids. To separate portions of this slurry, the acrylamide copolymer of

Example 1 was added with stirring in the amount of 1 pound per ton of solids and in the form of aqueous solutions containing 0.04 and 0.02 percent by weight of the polymer, respectively. The treated slurries and a portion of the untreated slurry were maintained undisturbed in sedimentation vessels for a period of one hour. At this time the concentration of solids in the settled layer was determined. The results are reported in table IV.

Example 5

The beneficiated "leach zone" ore of Example 4 was dispersed in water to form a slurry containing 45 percent by weight of solids. The slurry was found to filter very slowly and to give a filter cake containing only about 50 percent solids. A portion of the above slurry was admixed with an aqueous solution containing 0.04 percent by weight of the polyacrylamide of Example 1 in an amount sufficient to provide 1.8 pounds of polyacrylamide per ton of solids. The solids thereupon settled rapidly to separate a clear supernatant liquid layer and a lower layer containing 77.3 percent by weight of solids after 24 hours. The supernatant liquid was decanted and the solids worked gently with a paddle-like device with intermittent decantation of supernatant liquid to separate the product as a pasty solid containing 12.7 percent by weight of water.

The board considered Example 4 to be directed to the treatment of "a remaining mixture of particulate solids, some particles being coarse particles which are retained on 14 mesh and others being relatively fine particles which pass through 150 mesh." This interpretation conflicts with an affidavit of appellant Booth of July 15, 1965 interpreting Example 4 of the Pye patent, stating:

THAT in his opinion, to one skilled in phosphate ore technology and processing, there would be no doubt but that in said Example *it was only the materials smaller than 150 mesh that* were suspended as a slurry and treated with the polymer. [Emphasis ours.]

In his Answer, the examiner accepted this interpretation of the range of particle size present in Pye's Example 4, saying:

Examiner also accepts the argument that the Pye reference is not clear as to the particle size used in Example 4. For the purposes of narrowing the issues, the Examiner will accept the interpretation of the Appellant as to what is the particle size in Example 4, and present his arguments accordingly.

In view of the status of appellant Booth as an expert in the mineral dressing field and the acquiescence of the examiner in Booth's understanding of the meaning of the language used in Pye Example 4, it appears to us that a correct interpretation of the size range of the particles present in the sample treated in Pye Example 4 is that they are all particles smaller than 150 mesh. Thus, we conclude that the board erred to the extent that it adopted a contrary interpretation of the range of particle size disclosed in Pye Example 4.

The board's reasoning in support of the rejection is not necessarily vitiated, however, by its error in interpretation of the range of particle size taught by Example 4 of Pye. The board's reasoning was as follows:

Appellant's major argument and the determinative issue herein is based upon the contention that appellant's contribution is directed to a mixture of coarse and fine particles; whereas, it is alleged that Pye's compositions are composed of fine particles only. This argument does not apply to claim 14 which merely specifies "finely-divided solid material" and does not give either particle size or a range of particle sizes requiring the material to be the argued mixture of coarse and fine particles. As to this claim the rejection is quite obviously sustainable.

The remaining claims, while they do delineate a mixture containing both

coarse particles which do not pass through 65 mesh and very fine particles which pass through 325 mesh do not prescribe the proportion of each. Hence, any mixture having at least some particles meeting the terms of the above described limitations is included in the claims. This loose description, in our opinion, does not patentably distinguish over the mixture treated in Pye which, in our opinion, also contains relatively coarse and relatively fine particles falling within a portion of appellant's range.

\* \* \* \* \* \*

We agree with the Examiner that the properties of Pye's final compositions are, insofar as this record demonstrates, the same as that claimed by appellant. On the record properly before us the Examiner's rejection will therefore be sustained.

In considering the positions taken by the parties, we first observe that appellant, in his brief, acknowledges that the treating agent is known and has been used in homogeneous ore pulps. What is in contention is whether a process using this agent to treat a suspension containing both coarse and fine particles, to avoid problems of forming a settled-out layer of *coarse* material, is obvious in view of the teachings of Pye.

To distinguish his process from Pye, appellant is forced to argue that whereas appellant's process operates on a suspension containing coarse and fine particles, Pye operates on a suspension containing finely-divided particles, which appellant would imply means *uniform* finely-divided particles. However, Pye discloses use of the treating agent on a suspension having particles of less than 150 mesh size which would include a mixture of particle sizes including the largest particles that will pass a 150 mesh screen as well as much smaller particles, including

perhaps some that might pass a 325 mesh screen (corresponding to the lower limit claimed by appellant). Furthermore, the larger particles in this range may have a fairly rapid settling rate as pointed out in the following portion of the solicitor's brief:

> \* \* \* A view of any standard handbook will show that a 150 mesh has a nominal aperture of .105 mm. \* \* and that the time required for fine sand having a diameter of 0.1 mm. to setle 1 foot is only 38 seconds.[1] \* \*

1. Betz Handbook of Industrial Water Conditioning, Betz Laboratories, Inc., Phila., Penn., Fifth Edition, 1957, p. 6.

■ Thus, Pye's Example 4 may reasonably be considered to teach the treatment of a suspension of particles, ranging in size from particles that would settle fairly freely to much smaller particles, with an acrylamide polymer for improving the settling characteristics of the suspension. Given this information it would, in our opinion, be within the ordinary skill of the art to modify the process to operate on suspensions including particles of the greater size and for the purposes disclosed by appellant. The rejection of the process claims is therefore affirmed.

As to composition claims 11 and 12, Example 4 of Pye can also be considered to teach treatment of a pulp comprising a layer of settled-out particles ranging in size from 150 mesh on down. Thus, Pye is an equally good reference under section 103 as against the composition claims and their rejection is also sustained.

The decision of the board is affirmed.

Affirmed.

SMITH, J., participated in the hearing of this case but died before a decision was reached.